of America. Mr. Paradis for the petitioner, Mr. Gershethorn for the respondent. Good morning, Chief Judge Garland, Your Honors, and may it please the Court. Under Ex parte Cairn, an offense is, quote, not triable by military commission unless two conditions are met. First, it must be an offense against the international law governing armed conflict, and second, it must not be a crime that entailed a jury trial right at common law. Conspiracy, the inchoate offense of agreeing to commit a tort or some other law violation, fails both conditions. And for that reason, it falls outside the exception to Article III that the Supreme Court has recognized for law of war and military commissions. Is this really a conviction that we're reviewing of an ordinary inchoate conspiracy, though? Because specific findings were made in the specification that the petitioner intended to commit the elements of the substantive offenses. There were also findings that he participated by creating the martyr wills of two of the participants. And there was also a finding that the actual offense was completed because there was a finding that he researched the effects, the economic effects of the offense. So this isn't your typical inchoate conspiracy, right? This is a typical inchoate conspiracy because the essence of what he was convicted of is the mere agreement to commit a crime regardless of whether or not it occurred. And that's what the members found. And that's honestly what the government wanted this case to be about. This was a test case from the very beginning for the trial of inchoate, ordinary, vanilla conspiracy in military commissions. And to the extent the government had alternative theories of liability, which is what your Honor, at least to me, seems to be suggesting, they abandoned those. They abandoned those on the record and did so sui sponte by striking out language that in the charge sheet, had it been found, would perhaps have gotten closer to something like you're describing. I don't see how you can maintain that this is just the general run-of-the-mill conspiracy. The jury instructions here look nothing like the run-of-the-mill conspiracy instructions. They include much more. In fact, they include language that the agreement intended every element of at least one of the offenses. And then the instructions go on to list all of the elements of the substantive offenses. And here we have a special verdict form in effect that showed that the panel members found that he conspired with respect to each of those offenses. So in other words, they found that he intended the elements of each of the substantive offenses. That's not what you normally have in a conspiracy. That's not the way I read our normal conspiracy instructions. That's textbook conspiracy instructions, at least in the military. And there are two, I think, key elements of the instructions in this case that emphasize what an ordinary conspiracy this is. One is the judge's instruction to the members that finding that any of the intended underlying offenses occurred is not necessary. And second is that the members did not need to find that any of the elements, excuse me, any of the overt acts that the individual was personally proven to have committed were themselves criminal. This was an agreement to commit a crime. That's how the government pled it. That's how the judge instructed it. And that's ultimately is what the members found. And with respect, I think for this court to kind of go back after the fact and try and cobble together from snippets of the record, inferences that may have allowed the government in another case, in another case in which it had tried another theory of liability or frankly charged with a substantive crime tribal by military commission is certainly not how appellate review ordinarily takes place. Well, here's I guess what I'm driving at to eliminate any mystery here. You're asking us to review a conviction, not a statute. In this particular conviction here, there were specific findings that he directly participated with actual perpetrators of the September 11th attacks by preparing their martyr wills. And the instructions were written and the that he prepared the declarations in preparation for the acts of terrorism perpetrated. So that's that's what the jury found. So even if the even if in they were told you don't necessarily have to find that the offense was committed, et cetera, et cetera. We know that they did find it here. We don't know that actually, Your Honor, in part because the specific over that you're referring to, the preparation of the martyr wills actually was done. It was the actual Arabic. And this is in the record. I can provide the court page citations later was that he typed up the martyr wills based on videos after the September 11th attacks. There was there was no finding by the members that the law had any foreknowledge of any terrorist attack that he directly participated in any terrorist attack. And in fact, the record showed, and this is in our statement of facts, that he only even became aware of who the 9-11 attackers were after the 9-11 attacks, which he had no foreknowledge of. And so this is an inchoate conspiracy. He's being prosecuted here. I'm sorry. I don't mean to I don't mean to sort of divide your question, but this is an inchoate conspiracy. The government has stood by that this point in the appellate litigation. That's certainly what the CMCR found in its review, both of the record and the law of the case, that this is an inchoate conspiracy. This this is conspiracy. This is the infamous crime of conspiracy. Isn't it strange to say that military commissions lack the authority under the war powers of Congress? Isn't it the case that congressional war powers and the president's power, commander in chief power, should suffice to protect us from something like 9-11 happening, as well as to punish people who were involved in perpetrating after the fact? Absolutely. The only question is whether or not the war powers taken together or individually give Congress and the political branches the power to remove a conspiracy prosecution from federal courts and then shunt it off to some special executive trial chamber. This is saying they only could in that situation, such perpetrators planning, but but being stopped could only be tried in Article three court. If the only thing the government can prove or wants to try is an infamous crime like conspiracy, then yes, it does have to be in Article three court. That doesn't mean they can't be captured and held for the duration of hostilities, as most of the detainees in Guantanamo Bay are being. That doesn't mean they can't be targeted for a drone strike. That doesn't mean they can't be captured on the battlefield and held in any other way that is consistent with our law. But when the government goes, and this comes straight out of Hamdan, when the government goes from the need to target and capture and detain and to the effort to punish, to say what the law is in a particular case, that is when the judicial power comes to the fore. And if an individual were charged and convicted of aiding and abetting the crimes of 9-11, there's no question in your mind that that person could be tried in a military commission consistent with the international laws of war? There's certainly no objection under international law to trying aiding and abetting. And there's aiding and abetting is at the end of the day, a theory of liability. It's not an offense. I mean, you said there's no question on the internet. Is there any question under any other? It's statutes, and if the evidence supported such a conviction, that could stand. Certainly. And a proper aiding and abetting finding. But aiding and abetting, again, is a theory of liability. Conspiracy is a crime. It's a standalone crime. And I think that's the key difference. I just wanted to... So your answer would be if they had pursued the theory of liability, the Pinkerton theory of liability, that they could do that? If they charged him with a substantive offense and said, Mr. Ali al-Balul, you are being tried for the 9-11 attacks. You are being tried for murdering civilians. You are being tried for perfidy. You are being tried for attacking civilian objects for terrorism. And you're being tried for these things because of your role in this broader plot as an aider and abetter, or under a sort of joint criminal enterprise Pinkerton theory of liability. That would be a completely different case, and none of these issues would arise. What if you want it? What if the government wants to charge all of them or try alternative theories? Is it your position that the substantive crimes, the Pinkerton conspiracy can go to a military commission, but you have to have a separate trial in an Article III court on the Inchoate conspiracy? How much would that be how the system was intended to function? Well, the system was intended to function that way because that's what Article III says, that if you are trying a crime, the trial of all crimes is to be done in the courts of law. But you just, no, the Pinkerton crime could be done in a military commission. The substantive crime, if that were also charged in a case, could be done there. The aid and abet can be done in a military commission. I'm sorry if I misspoke. Pinkerton, as I understood Judge Wilkins' question, I did not understand that to mean a separate crime of conspiracy. Simply, again, a theory of liability for proving the underlying law of war. I understand that, but you were saying crimes have to be in Article III, but it's certainly a crime to commit a substantive offense via the mode of Pinkerton conspiracy. So I get that that is a liability for the crime. That's a crime, and that's not tried in Article III. It doesn't have to be tried in Article III court. Well, this is, you know, this initially at least sounds like a formalistic argument, but it's what the attorney general used after the Lincoln conspirators. It's what the Supreme Court uses in Karen, is that there is a distinction for Article III purposes between crimes and offenses. Offenses like petty offenses, contempts, and law of war offenses are not, again, in the phrase of the attorney general opinion, not classed crimes but offenses, and therefore are outside of Article III's exclusive. But what does the word define? What work does that word define do in the define and punish clause? It doesn't mean at a minimum Congress can say we're going to loop these conspiracy theories together. We're going to say that Inquiet conspiracy can be tried just like Pinkerton conspiracy, just like other ancillary offenses in a military commission. Well, it means to codify or make more specific an offense that actually exists under international law. It does not mean... Mean by make more specific. Well, for example, the crime of waging aggressive war is a crime as an offense, excuse me, under international law, and its elements have been a subject of debate really since Nuremberg. And if Congress were to say, this is how we recognize the offense of waging aggressive war, and all of the elements are consistent with the elements of that offense as it's understood... But they can charge for conspiracy to commit aggressive war. You would agree with that, that that can be tried. It was, but that's a very different kind of offense. That's actually a separate offense under international law, which is not... Conspiracy itself is the violation. And why couldn't Congress say, at least in the world of terrorism, conspiracy by itself is a form of waging aggressive war that we think can be tried before military commissions? Why doesn't the define word give them that much leeway? Well, first of all, it's not what Congress did here. This is not an aggressive war prosecution. This is a conspiracy to commit various offenses, some of which are federal crimes, as this court found in this ex post facto issues here. This court found that the charge against Ballou was essentially an assimilation of 18 U.S.C. 2339. And so that's not what Congress was doing. But even with respect to that, conspiracy to wage aggressive war is not an incumbent offense. It is an offense where it's a way of holding individuals who planned an aggressive war that has taken place responsible. And just to your point again about the define and punish clause, to the extent there's any ambiguity about what is required to do that, maybe Congress gets some leeway at the margins. Here, though, we have a crime, an infamous crime, conspiracy, that the government itself stipulates is not an offense under the law of war. It's not an offense under international law. There are precedents from this court explicitly holding that. And to the extent that Congress is not simply defining an offense to make it more specific and accessible, but making it or relabeling an infamous crime to turn it into an offense against the law of war to escape the requirements of Article III, that is unconstitutional. And that's certainly not supported by the define point of the define and punish. When you said before that this is a plain, vanilla, ordinary conspiracy, it is a conspiracy with a particular object. And the object is committing war crimes, to commit a war crime. Is this something that was tried in common law? That is, in the words of the Northern Pipeline, was this tried at Westminster in 1789? Conspiracy to commit a war crime? A conspiracy to commit any offense is something that was tried. Well, we don't know that, right? Is there any example of a conspiracy to commit a war crime, rather than, with not just something that, something like murder, but an actual war crime? Was that ever tried? Well, we know that it was, that conspiracy to commit any violation of the law is something that had to be tried at Westminster because of Callan v. Wilson. Callan v. Wilson is a case that the Supreme Court in Kieran cites for the scope of the jury trial requirement. And if you go to Callan v. Wilson, the Supreme Court unambiguously holds that conspiracy is subject to the judicial trial requirements of Article... Callan, I think, was a conspiracy to extort. Is that right? It was, I believe it was a conspiracy to interfere with lawful business. Yes. That's not exactly the same thing as a conspiracy to commit a war crime. Well, for Article... The fact that that kind of conspiracy could be tried in common law doesn't necessarily mean that something so close to something that could not be tried at common law, namely a war crime itself, could also not be tried at common law. It does, actually, because again, the analytical framework that governed Callan is the same analytical framework that the Supreme Court applied in Kieran. And what Callan holds is that even when the underlying offense, but even when the object of the conspiracy does not entail a judicial trial, a conspiracy, the separate, standalone, infamous crime of agreeing to commit a crime, regardless of whether it ever takes place, that is an infamous crime that is subject to the jury trial requirement. And that is a crime. That is the distinction between a crime and an offense. So a conspiracy to commit a petty offense has to be tried and is subject to the jury trial requirements. A conspiracy to commit a contempt, if that could ever happen, would be subject to a jury trial requirement. And a conspiracy to commit an offense against the law of war is subject to the jury trial requirement because of the really particular and... That part that's unclear. The examples you give are all on the low side, conspiracies to commit things that are misdemeanors, essentially. This is something quite different. This is a conspiracy to commit something on the high side. None of those misdemeanors could be tried in a military tribunal under any possible theory, but the object here could be tried in a military tribunal. And I take it what you're saying is that the conspiracy would have to be... If you wanted to charge both, the conspiracy would have to go forward in an Article III court and the object would have to go forward in a military tribunal. We'd have to split the indictment, essentially. Is that right? If the government wanted to do that, that would be a strategy that would be available to it. If it couldn't prove the substantive offense in a military commission and was left only proving the conspiracy, yes, it has to take an individual to an Article III court, which is what they did in the Ghilani case, which is what they've done hundreds of times in terrorism cases since September 11th. They haven't split them hundreds of times. That's the question I was asking. That's true. There has been no split because, frankly, I think this case is still pending and the government wants to know whether or not it can take... Again, the offense that is probably the most emblematic of the federal judicial power, conspiracy. Conspiracies are charged every single day, including conspiracies to commit terrorism or other very serious crimes. The last time we met, we were greatly interested in the fact that you had not raised these arguments before and we disposed of the case on plain error review. Is there some reason we shouldn't use that standard again this time around? Two answers, if I may, Your Honor. First is, even under plain error review, we prevail here. That is first because conspiracy under Callan v. Wilson, it is plainly unconstitutional to remove a conspiracy prosecution from the federal courts to some special executive trial chamber. That's a holding from the Supreme Court. With respect to the fourth factor that goes into plain error analysis, again, I struggle to imagine a more brazen challenge to the integrity of the justice system than the idea that the political branches may assume for themselves the power to remove a crime as emblematic as conspiracy is from the federal courts. In Shore and Wellness, the Supreme Court tells us that we have discretion to consider forfeited arguments, but those are both civil cases, aren't they? This is criminal context. Doesn't that provide a different outcome? Does it provide a different guide for us to use, whether we have discretion or not? No. With respect to the Article 3 question, I think it cuts quite the other way because in civil cases, for a variety of reasons, can be adjudicated outside of the courts just in arbitration. How are we to exercise the discretion in Shore and Wellness? What's the standard we're to use? Well, the standard this court uses is it looks to see whether or not there's an Article 3 violation. I would say in a criminal case that the standard of review is probably at its highest, both textually, the Constitution says the trial of all crimes is to be in the federal courts. It does not say the trial of all civil claims needs to be in the federal courts. Okay, so even if we were to agree with you and looked at this under de novo review, how do you get around the statement in Kieran that we are only to overturn the work of the military commission when we are clearly convinced that the work of the military commission was unconstitutional? In Bill 1, we looked at this and we said it's not clear to us. You have the Civil War cases, you have the World War II cases, Kieran itself, and we have no instance where the Supreme Court has clearly said that the jurisdiction of the military commission is limited to international crimes. You have to show us that there's a clear history of not allowing these prosecutions to go forward. In light of Bill 1, how can you make that case? We can make that case for two principal reasons. One is Bill 1 was dealing with the ex-prospecto clause, not Article 3, and the considerations, frankly the law governing Article 3 and the ex-prospecto clause are quite different. But ex-prospecto is also a separation of powers issue, right? Yeah, it certainly is a separation of powers issue, but this is not just a separation of powers question. It's a question about the duty of the courts to protect the federal judicial power and to not allow it to be encroached upon. Isn't that what ex-prospecto is to prevent Congress from encroaching on the power of the court? That's the nature of the separation of powers argument in ex-prospecto cases and the Supreme Court's ex-prospecto cases. That's true, but I think the Article 3 issue raises it to quite a different level where you have the political branches essentially attempting to push the district courts to the side for only the trial, and I think that's one of the most peculiar things about this military commission system. This is not a military commission like in Kieran where the standard of review being applied is more generous because it's habeas corpus, right? Ex parte Kieran is a habeas case, as are most of the others. This is a case where essentially the political branches have replaced just the federal trial courts with executive trial chambers and then put it under the direct appellate review of this court. In this respect, it's much more like a bankruptcy court than it is— Unlike civil cases where maybe there's concern that party consent will mean the courts will never have an opportunity to address an incursion by the legislative branch on core judicial power, we don't have that concern in criminal cases, do we? Don't criminal defendants have every incentive to raise claims in the first place? We don't worry too much about them consenting across the board, and even if they don't, we always have plain error review, so the Congress just can't keep these constitutional questions away from us. Again, we certainly think we prevail under plain error review. I don't think there can be a reasonable question that Callan v. Wilson and ex parte Kieran taken together dispositively demonstrate that where the government concedes it's not an offense under the law of war and where the crime itself is, the Supreme Court has— That depends on how we read Kieran because Article III, which you've cited many times, does not have an exception for military commission, so under the plain language of Article III, you have a great case. We have Kieran, which creates an atextual exception to Article III, and the question then is how to interpret that exception sensibly, and my concern has been why draw the line at international laws, the atextual exception, rather than U.S. historical practice. Well, two answers to that because I would like to address U.S. historical practice, but the first is, and this comes right from page 29 of Kieran, where they talk about, and then a broader discussion, I think beginning on about page 35, where the Court talks about, again, this offense-crime distinction, that law of war offenses, to the extent there is a discrete body of offenses that violate the law of war, let's just assume for the moment under international law, that those offenses just are not crimes. That's why there is this atextual exception to Article III, because Article III speaks to crimes, and offenses, like petty offenses, are outside of that exception. And spying and aiding the enemy also outside? Yes, the Supreme Court squarely holds in Kieran that spying and aiding the enemy are offenses, not crimes. They're not international law offenses. Well, the Supreme Court certainly thought so. I understand that the scholar... No, they're not. We may think... I don't... I've never seen a court case saying that they're not subsequent to ex parte Kieran. And so, to the extent that the law that governs this... that the law that... Sorry. That the law that governs this case is ex parte Kieran, the Supreme Court is infallible because it's final, not because it always gets the law right. And here we have a situation where the Supreme Court holds spying to be a violation of international law. And also, I think, to the extent spying and aiding the enemy stand apart as exceptional in any way, they've been exceptional from the very beginning of the Republic. Well, that's the government's argument about conspiracy as well. And the question is, if the Military Commissions Act and the Uniform Code of Military Justice, they refer to offenses that, by statute or the law of wars, can be tried in military encompass what? I mean, does everything have to also be a violation of the law of war, as you've just characterized? I thought that spying and aiding the enemy were the by statute ones. But you're saying, no, no, they're also violations of the law of war. So what's that language? They may be the class of by statute. That may be the American common law of war the government talks about. But that doesn't necessarily... I'm sorry. But once there's an American law of war, then the government's saying, if there's a category there, why not this? Well, why not this? Because the government has no good tradition to demonstrate, certainly not the tradition it has of spying and aiding the enemy, to get around the plain language of ex parte Kieran on this. And the Civil War Military Commissions seems to be what they hang their hat on the most. In the Lincoln case, they weren't charged with conspiracy. Conspiracy, at most, was the broad theory of liability. Because if you go to the specifications against each individual, they're charged with aiding and abetting the actual assassination of the president, along with other substantive offenses, including attempts. And we know for a fact that Lincoln was not a conspiracy case, because three years later, John Surratt was tried for murder and for attacking the president with the same conspiracy language in his charge sheet, even though the federal conspiracy statute was enacted after he was charged. And so it was a common charging practice back then to, say, conspire, aid, and abet. And for the government to look back to these Civil War-era precedents, where conspiracy was a misdemeanor, it was a misdemeanor that carried two-year sentence. And that was true up through and including ex parte Kieran. The conspiracy law doesn't really blossom until the late 1940s anyway. And so all of these precedents the government's looking back on, where it's saying, oh, conspiracy, conspire, conspiracy, they're not talking about the offense of conspiracy as it's being used in this case. Can I ask? Yes, I'm sorry, go ahead. Sorry. The thing that I find just difficult here is, first of all, when Article I was written, where would the founders have thought that Congress would look to determine what the How much would just be their own judgment? And in particular, in a case like this, where you have war crimes as the object. And the question really is, how big an orbit around war crimes Congress has the authority to define and punish, or include in its other war powers? How do, what would they, there weren't, I assume there were not tribunals for human rights violations back then like there are now. There probably weren't a bunch of law review articles and international law scholars writing, where was Congress supposed to look? And how do we know it wasn't to look internally and just to exercise its own judgment in defining that orbit around indisputable international law offenses like the commission of war crimes? Well, again, define does not mean creating an orbit. It doesn't mean create a penumbra around offenses against the law of nations. It actually means to narrow them down to make sure that they are a clear and narrow. So even if something was a violation of international law, all Congress, Congress can only go narrow. And I can't simply say, how is that committed? How is it violated? Who is responsible for that war crime? Make more specific, you know, that's what define means to make something more specific. It doesn't mean that may say that may say, look, committing war crimes is horrible. And here's the different stages and manifestations of war crime commission that we intend to punish, including the planning of it, at least with an overact and the level of intent that was at issue here. But again, the overact requirement A is not criminal here. And B is irrelevant to the question of what the actual crime Congress is identifying is. And what would the framers have done? They would have looked to state practice. And what does state practice tell us here? State practice tells us that the United States does not think conspiracy is an offense against the law of war. It's represented that here. And when you say state practice, you mean the United States or states as a nation? Well, everybody, every, every part of the international community, the United States and abroad. And we know as a matter of state practice, that conspiracy is not one of the offenses that Congress may codify in either pursuant to the defined and punish clause, because every military commission precedent, every international criminal precedent, including up through and including the tribunal that tried Saddam Hussein. But I'm really trying to talk about, again, what, what was the thought of that? We have to figure out where the constitution, how much leash they give Congress and where they tell Congress to start its analysis from and deciding what is an offense against the law of nation. Doesn't the Supreme Court in our Jonas offer some answer to Judge Millett's question? That's correct. The court says it depends on the thing done, not a declaration to that effect by Congress. The define and punish clause in part was established to respond to our international obligation. That's exactly right. It was an effort to essentially ensure that the United States conformed with international law, not that it struck out on its own and created its own separate American international law. And I would say not just our German. I would actually point this court to the case of the antelope, because I think that really does get squarely to your honor's concern, is there's a situation where the United States is attempting, along with Great Britain and other nations, to abolish the international slave trade. And they essentially make slave trading a form, a basis on which you can get prize in 1820. And when that goes to the Supreme Court, Supreme Court says, no, that's beyond the power of Congress, because as reprehensible and immoral as the international slave trade may be, and as compelling as Congress's interests in abolishing the slave trade may be, they cannot take something that is not an offense under international law. That's something that's not piracy and make it such simply by calling it such. Didn't Arjona actually support the notion that Congress has a little bit bigger orbit, because there was all about counterfeiting currency. And they said, look, we need to sort of have a practical understanding of how this is to be enforced. And we are going to take it out to include security. Take securities and war crimes and compare little apples and oranges. But the concept of Congress having leash to draw a wider circle, it still has at the core that international violation, but includes practical enforcement of it. But here, sorry, I'm sorry. Here, the precise problem is that there is no core of an international violation at the bottom of this offense. This offense is the agreement to commit a crime. That is an infamous crime that has been recognized. We don't have to decide that. We only have to decide whether the agreement to commit a war crime and to take at least one overt act and to have intention, whether that's within Congress's orbit. We don't have to decide whether any conspiracy or any other form of conspiracy would. Well, even when the underlying offense, because candidly, your honor, this is not just the nose under the tent. This is the camel entering the tent. This is Congress saying we can try conspiracies to commit any offense under the law of nations in a special executive trial chamber. When you actually begin to think about the breadth of what offenses against the law of nations actually encompasses today, you are creating a precedent where almost any conspiracy, if the government can relate it in some fashion to national security or the war powers, would then be triable in a military commission. At the same time, why is Congress held hostage to someone somewhere decided that conspiracy to commit genocide, well, that's okay. That's different. And conspiracy to commit aggressive war, well, that's okay. We'll let that one in the door. Joint criminal enterprise, we'll let that in the door. Pinkerton, okay, we'll let that in the door. But golly, gee, if you call it inchoate conspiracy. Well, it's not just calling it inchoate conspiracy. It's what you're punishing. Here, you're punishing the fact that Beloul agreed with others to commit a crime, regardless of whether or not it's an agreement. Yes, yes, it's tied more. It's a form of liability, but it is also the agreement is essential elements in those other forms of conspiracy as well. But they are how you prove what is, in fact, an offense against the law of nations. And also, like, for example, again, conspiracy to commit a genocide and aggressive war are not inchoate offenses the same way that inchoate conspiracy to commit war crimes is. And to the extent... Can you clarify that for me? So are they not freestanding crimes, independent crimes, apart from the acts of genocide? That's correct. There's sort of a theory of liability under international law for when a genocide and or an aggressive war occurs. There's been no example of someone being prosecuted for a conspiracy to commit genocide in the absence of a genocide that they are being specifically held responsible for. So you're saying that it wouldn't extend there? I mean, my understanding is that you can have this conspiracy. There's certainly no precedent for it. And the International Criminal Court actually does away with the conspiracy. The statute of the International Criminal Court did away with the conspiracy to commit both genocide and aggressive war language. Exactly. Congress's working room? I mean, shouldn't this be exactly the area they get to... Sure. And if Congress wanted conspiracy to commit aggression or conspiracy to commit genocide to be within the jurisdiction of a war crimes tribunal it created, that is maybe perhaps part of its discretion. If they called this freestanding conspiracy and they called it conspiracy to commit terrorist aggression, that would be OK. No, I think that sounds much more like conspiracy to commit a war crime than conspiracy... It's like conspiracy to commit aggression. I'm just putting the adjective terrorist in front of it. Well, but aggression has a very specific meaning under international law that does not apply to non-state actors. Under these circumstances, wouldn't this be... I mean, weren't the events of 9-11 aggressive war? So couldn't they have been charged with... Couldn't Al Balul have been charged with conspiracy to commit aggressive war? No, aggression is a crime that applies to state actors only under international law. Sorry. But why can't Congress say in this modern... Why can't it be the lead or at least look out there and survey... There's ambiguity... Sorry. Why can't they lead and say the time has come to go to non-state actors? Two principal reasons for that. First of all, if we're only talking about the Define and Punish Clause, then they would be in the business of making not defining an offense under the law of nations. And that is what every precedent on the Define and Punish Clause says Congress can't do. That does not mean, however, that Congress cannot create such an offense using its other enumerated powers. The only question in this case is not really... It's not really a question of congressional power in this case. It's a question of the exclusive judicial power of the Article III courts. Could Congress take any offense? You know, that is how the government itself has framed this case. Can Congress take a purely domestic law offense passed under any one of Congress's enumerated powers and transfer it into a special executive trial chamber? And when viewed that way, the encroachment on Article III is not just slight, as Chief Justice Roberts said in Stern. It is utterly brazen. It is going after the... Probably the defining offense that people associate with the federal judicial power, which is conspiracy. And that's certainly been true since the 1940s. And when the government itself concedes that it cannot satisfy the standard that Kieran sets out on page 29, and when the government itself concedes that the United States does not recognize conspiracy to commit war crimes as an offense under international law, and then that concession is supported by every relevant precedent, at least since 1945, then we would say going much further back than that. All right, Mr. Paradis, you're out of time. Following our usual tradition, we won't care, and we'll let you have a rebuttal anyway. Thank you, Your Honor. Sit down with the government and I'll speak. That would be great. Thank you, Your Honor. Chief Judge Garland, and may it please the Court. In the Military Commissions Act, Congress responded to the call from the Supreme Court and made clear its judgment, shared with the executive branch, that an alien, unlawful enemy combatant may be tried in a military commission for conspiracy to violate the laws of war. Nothing in the Constitution precludes that shared judgment. Congress did not fabricate conspiracy from whole cloth, and that's true in at least two important senses. First, Congress's judgment is consistent with the experience of our wars and the acts and orders of our wartime tribunals, which in turn reflect a long history of trying in a military commission conspiracy to violate the laws of war. That includes the highest profile military commissions our nation has seen, including the trial of the Lincoln conspirators. But the problem there is you have the martial law, right? We don't know what it is. We don't know what type of law of war military commission this is. And if it's under martial law, your analysis fails. It's not that the Lincoln cases are not as clear as the government keeps maintaining because of the martial law component. So, Your Honor, it's not just the Lincoln conspiracy. Lincoln, it is Colonel Grenfell and it is Henry Wirtz. It's also the conspiracy charges at issue in Kieran and in Colpaw. And with respect, Your Honor, if I could just... It's not just... There's a question that in Kieran and Colpaw, the military commission thought it had that authority, but those haven't been subject to judicial review on that question. That's right, Your Honor. But I think in both, for example, in Wirtz and in Grenfell, the charges themselves specified that what was at issue was a conspiracy to violate the law of war. And that's indicated in the charge itself. And then with respect to the Lincoln conspiracy, that is the thrust of the attorney general analysis was that this could be tried in a military commission. If I could... Not because the attorney general thought it violated the international law of war. No, Your Honor, I don't think it was because... But I think that that... And if that's not the limitation on military commissions, what is the limitation? In other words, if military commissions are not limited to trying offenses that violate the international law of war, what limit is there in terms of what crimes can be tried or offenses in the commission? So, Your Honor, I think that we would say at the very least, at a minimum, it has to be trial of an enemy belligerent, and the crime has to be in the context of and associated with hostilities. Okay. But that's... So let's assume you have such a person. Can that person be charged with a crime that is not a violation of international law? And if so, are there any limitations at all in the government's view about this? So, Your Honor, the answer to your first question about the international law of war is yes, we do not believe that is the proper limit. I'm sorry, you do not or you do? We do not believe it violates the international law. That's my question. What is the limit then? So, Your Honor, I don't think... Other than the fact that there has to be an armed conflict and an enemy command. So I would suggest to the court that this case does not approach whatever limits there are, there are at least the two reasons. First, it's firmly grounded in history. And the second reason is that... What is firmly grounded in history? I'm sorry, Your Honor? What is firmly grounded in history? The trial of conspiracy to violate the laws of war in... American history, domestic history. In American domestic law of war. That's right, Your Honor. And then second, it's firmly tethered in international law. To pick up on the point that Judge Millett was making, there is no dispute that many of the objects of petitioner's conspiracy are themselves violations of international law. And there's no dispute that joint criminal enterprise and aiding and abetting are available modes of liability to help facilitate those prosecutions. But Mr. Kershaw, I mean, why... The government, Blue, argues and Annika's brief supports this. You don't really respond to this in your brief. The Annika's brief, this is the one of international scholars. They say that international law has rejected conspiracy as a stand-alone offense, except for genocide and wars or aggression. And they list... They go through five or six decisions and treaties, which is what Karen says we should look to. They start with Nuremberg. They go to the 1945 principles of international law found in Nuremberg, which expressly recognize only conspiracy to wage aggressive war. The Geneva Convention doesn't include conspiracy to commit war crimes. The two charters creating Yugoslavia... I'm just going through the list in their brief. Yugoslavia and Rwanda don't. Conspiracy only for genocide. And the Rome Statute. So their point is that while Congress definitely has authority or discretion under the Define and Punish Clause to interpret the feeling of ambiguities, what it can't do is define as an offense trial before a commission, an offense that international law has expressly rejected. That's their point. So, Your Honor, we... What's the government's answer to that? The answer to that is several fold. First, we reject the premise. I agree with that. We'll come back to the premise. The second one is we don't agree that there is a consensus in international law that conspiracy cannot be tried. There's a difference between... You disagree with their conclusion from all of these treaties. We think that... So what's the best evidence you have? The government has... Tell me what it is. What is the best evidence you have for the proposition that an international tribunal or an international commission or a group of them has recognized as a violation of international law conspiracy to commit war crimes? Your Honor, our contention is not that... There are examples in our brief, first of all, of both the French and the Dutch examples where that was tried. Second, the point is not that... Our point is that although there isn't yet a consensus that international law permits that, there is no... That lack of consensus is a suggestion that international law forecloses it. Those are two very different propositions. But the point of the analysis in the brief is that each of these treaties and agencies actually considered the possibility of conspiracy to commit war crimes as a violation of international law and rejected it. And in fact, the only one they permitted in the end is conspiracy to commit genocide. So, their argument is that this decision is resolved internationally. It's done. So, Your Honor, I don't think that that's correct. And I don't think that... I understand why. Because there's a difference in international law between a consensus that is something is impermissible and... The absence of something, Your Honor, if I may, is evidence that there isn't yet the consensus. A lot of treaties... This happened, in fact, in Nuremberg. What happened at the London Charter Council was that the parties got together. And because there was no consensus on conspiracy, they omitted it. That is not the same thing. An effort to get consensus in international law is not the same thing as saying that international law forecloses it. But would you agree, then, instead of... Would you agree that if there was clear evidence that international law had rejected it... And again, I understand you quibble with the premise. We can come back to that. But would you agree that if there is evidence that international law considered and rejected an offense as a violation of international law, that Congress then could not define it? So, Your Honor, I just want to be precise. I think considered and rejected, the answer to the question is no, Congress could still do it. If you're saying that international law actually forecloses it, then I think under the define and punish clause, Congress would face a much deeper hurdle. Of course, here we don't have just define and punish. We have all of the additional war powers, which are not so limited. And so I don't think, Your Honor, that the international law of war is the standard. And I don't think that that's what the Supreme Court has thought. Is history a limit? And looking for a limit, imagine Congress a few years from now makes cyber attacks by al Qaeda, a war crime punishable by military or tribal by military commission. Is something like that impermissible or not? So, Your Honor, I don't want to say that that is impermissible. Let me make two points here. The first is you don't want to say I don't want to say it's impermissible. Let me explain why. I think this case is easier precisely because it has a historical grounding and because it is tethered to international law. And that's what makes this. And if I may, the third is because Congress and the president have agreed. And so we're in the Youngstown Category one framework for the first time in our nation's history. The question about whether cyber attacks could be used. So in the end, I mean, that doesn't answer the question if there's an independent constitutional. Absolutely, Your Honor. And we agree that it's this court's job ultimately to decide that question. But I would point out that what Hamdan thought and what the justices thought of Hamdan was that Congress's views on this question were quite relevant to what the court was thinking. And I think that's further evidence going to Judge Tatel's point that what the court was asking was not really the question of what does international law think? Because surely the court didn't need Congress to decide that. What the court thought was that Congress could weigh in intelligently on the question about whether conspiracy to commit a war crime was itself something that could be tried. Now, going to your cyber attack point, I think that's exactly why this court should be very hesitant to reach out and decide the precise limits in a case that doesn't present them. That's an interesting point for the government to make. I'm really puzzled why we are here with this very difficult, very important, very cutting edge question when it appears from the government's theory that the government could have charged this terrorist with aiding and abetting or with joint criminal enterprise. And I'm just baffled by that. And I wonder if you have an answer. Your Honor, there was a discussion in the military commission proceedings of proceeding with an enterprise theory. And the military court had cut back on that because it perceived in the use of the word enterprise some tension between RICO and the military commissions where it understood Congress to have deliberately excluded enterprise. But putting that aside, Your Honor, I guess I don't have, as to the reason for the military the court's charging discretion, that the prosecutors pursued a theory that Congress had blessed and that had been endorsed. And that is in all seven of the current cases where charges have been referred in addition to the substantive crimes there. So this is something that Congress put as, and Congress and the executive identified as a useful and important part of the aspect of the armed conflict. And it was certainly well within prosecutorial discretion to charge to take Congress up on that invitation. Let me follow up in a slightly different way. Is it your view on this case that Al Balul could have been charged with aiding and abetting the war crimes of 9-11? And relatedly, could he, after this case, were on bond court to agree with the panel? I think it is. Could he? I think it is quite possible that he could be charged with, for example, a joint criminal enterprise and perhaps with aiding and abetting. Whether the commission would convict or not, I don't know. But I think that would certainly be something that might be charged. But I don't think that that changes the question. Is there any double jeopardy part of that happening, actually? I haven't looked at the double jeopardy analysis. It would depend, of course, what this court said. But I think the important thing here is that we have a conviction from a military commission jury. And the fact that the prosecution might or might not have pursued a different theory really, I think, is sort of a different question. I mean, the court has to face just— What Judge Pillard's question may be getting at, and I'm not trying to put words in her mouth, is what is the necessity for proceeding in this manner? In other words, you cite cases from the Supreme Court saying that the law of war is flexible, responds to need, and the like. And so what is the need? Because, as I hear Judge Pillard's question, rather than branching out into this other area, there were clear options available to the prosecution. And both Judge Henderson speaking for the in-bank court and I writing separately have tried to understand why this is necessary to the extent that military tribunals are an exception to Article III. So there are, I think, two aspects— —to respond to the conditions of war. So I think you're— —rejected. I understand the battlefield argument. But Judge Pillard is raising another issue that presumably avoids the encroachment concern that, at least for the panel here, was the underlying concern. So, Your Honor, if I could respond, I think there are two aspects of your question that I'd like to answer. First is conspiracy itself. And I actually think—I believe it was Judge Pillard's question earlier to Petitioner's counsel that got at exactly why conspiracy is very important. In a situation in which there are—when the objects of the conspiracy are attacks on civilians and attacks on civilian objects and the like, it's very important that conspiracy be available so that the government need not wait till the underlying war crimes were committed before it acts and charges. As to what— —address that. —Well, Your Honor, I think— —can define such an offense and Article III courts can try— —OK. So that's the second part of your question. —the crime response based on the plain text of the Constitution. So you've got to go further to prevail, don't you? —Your Honor, I don't think I—to prevail, I need to. But to answer Your Honor's question, I do. I don't—I think, actually, Congress has made that judgment. But to answer your question, I think military commissions— —conditions and that Congress can make any domestic offense a matter for trial before a military commission when it's a time of war and the person is, quote, an enemy combatant, close quote, which is a term that has evolved over time under the executive branch's definition. —So, Your Honor, the answer is no. But I—you've asked a number of questions that I'd like to respond to them. And so let me—let me do two separate things. First of all, with respect to why military commissions are important, I think they are important precisely because they offer—they reflect— —That's not the question. —OK. I had understood Your Honor to ask that question. —I wasn't challenging the importance of military commissions. —Well, Your Honor— —I'm asking, when are they necessary? And that's been the Supreme Court's approach, both the plurality and the defense—excuse me, and the dissent. —So, Your Honor, I think, first of all, they are necessary. They offer an important—they offer an important protection for the reality of the kinds of captures we're talking about here, where they offer a more—they—things like the hearsay rules and Miranda that don't reflect the realities of the battlefield in the same way as other prosecutions. Now, with respect to your question about whether any domestic crime could be moved to a military commission, the answer to that is no, as I've—as—as I've tried to explain. There has to be—it has to be an enemy belligerent. It has to be in the context of—in the context of and associated with hostilities. But again, Your Honor, I don't think that this case presents those outer limits, and I think that the court— —We're trying to understand—I thought that was the thrust of Judge Tatel's questions. What are the limits to this concept of conspiracy? —So, Your Honor— —Tomorrow, and all of these trials that are going on or motions being filed in the district court are no longer within the jurisdiction of the federal district court. —So, Your Honor, I think it's critically important, though, that this court step back and be very wary of setting the outer bounds in a case that doesn't require it. The— —I agree that we—we should not set the outer bounds. I totally agree with that. But we need to know what the consequences of our decision is. And so— —So, Your Honor— —Let me just follow up on my question about limits for just a minute. Suppose—suppose the government discovers in a Washington apartment three individuals, four nationals who are here lawfully, families, and in the apartment is—they find explosives, weapons, al-Qaeda materials, and a map of a Washington metro. —Can those individuals be arrested and transferred to a military base and tried before commission for conspiracy? —Your Honor, I—I'm sorry. Can you give me the fact that I have to go again? There's a— —The government arrests four individuals in a Washington apartment, and they have explosives, weapons, guns, al-Qaeda materials that—from online—online al-Qaeda materials about terrorism and—and a map of a Washington metro. Can they be charged with conspiracy and transferred to a military base and tried before a military commission? —Your Honor, I think it would depend on a number of factors, including whether they were aliens, whether they were— —They were. I just told you. They were aliens on either a lawful visa. —Your Honor, I—the answer to—I don't know the answer to that question. I assume that the answer—it seems like that would be enough to charge conspiracy. —Yeah, under you, too. —It's evidence that they were going to attack civilians, but can I— —Of course, it's enough to charge conspiracy. It's a classic conspiracy. My question is— —Conspiracy to commit war crimes. —Yeah, blowing up the Washington metro. Now, is—is—is—is the ongoing—is—does the—is it your—is it the government's view that there's enough authorization in terms of armed conflict and possibly identifying these people as enemy belligerents to charge them in a military commission? That's my question. —So, Your Honor, I think that might well be enough, just as if we had encountered the 9-11 attackers as they were getting on the plane, that might have been enough. But I think it's important, Your Honor, that you—that the court understand that what we're talking about here is not at the outer boundaries. Mr. Ballou was not, in fact, captured— —We understand that, but my question—I asked you my question in terms of our need to understand the consequences of a decision. I totally agree with you that the hypothetical I gave you is not the Al Ballou case. Suppose—let me just change one thing. Suppose instead of al-Qaeda material in the apartment, they found material from ISIS, ISIL—extensive online material in—about domestic terrorism produced by ISIL. What about that? Could they— —I don't know the answer to whether the United States has taken a position on—on whether ISIL is engaged in hostilities against the United States— —According to yesterday's New York Times, the United States has flown almost 1,400 missions against ISIL in Syria. Your Honor, that would be a question for the charging decision, but if I— —But your theory is—but what you're telling me is that each of these cases under the government's theory, these conspirators could be tried, could be removed to a—a military base in the United States and tried before a commission, right? So if they were engaged in hostilities and enemy belligerence, that may well be the case, Your Honor. One other—I just have one other question. Could you say something about your view at this point about the standard of review we apply here? You—you say in your brief that—you say that Sheriff reinforce—Sharif reinforces the view that—that the court hasn't created any exception for normal Article III cases, right? Yes. Yeah. So do—do you think—do you—before the panel, the government's view was we would review this de novo. Has that changed? Your Honor, the government's position is that the court should review per plane error. I—I think the— How do you reconcile that with Sharif and Shor where the court—although the personal side of the Article III issue had—had conceivably been waived, in both cases, the court went ahead and resolved the question as to whether there was a structural Article III problem. Because I think— Don't you have to do that here? No, Your Honor, I don't think so. I think what happened in Sharif at the—at the—what the court did at the end of its circuit to determine whether the Article III claim had been forfeited— Oh, but that's after the court had concluded that there was no structural Article III problem because of the way the agency was structured there. It concluded that they had—that—that there was sufficient federal court or judicial branch oversight so that as long as it was done with consent, there wasn't an Article III problem. But what the court— But my point is that the court went ahead and resolved the structural Article III question. It decided, de novo, that there wasn't one. So I have two points on that, Your Honor, if I might. First of all, what the court did was remand to the Seventh Circuit to determine whether it—that the objection had been forfeited. What was before the Seventh Circuit was the question about whether this was, in fact, a stern claim and whether there was consent at all. And what the Seventh Circuit said on remand was even assuming that this was an unconsented, stern claim, the—that Sharif had forfeited that claim, which is exactly what the Supreme Court has suggested. But the court— Second, I think the broader point here, Your Honor, is really the one that I understood Judge Millett to have made, which is that what the cases about Shor and Sharif are getting at is something quite different. They're getting at the situation where if you honored consent and forfeiture, the Supreme Court would never be able to resolve the question. That is not the case here. This is a very different context coming up in the criminal context, where the reason there's a plain error issue is because there was a boycott by petitioner of the proceedings themselves. And certainly the—these issues are being litigated in the subsequent military commission proceedings. And so the kinds of concerns that cause the court to—to exercise its discretion to take on the Article III analysis in those cases are really quite different. As you say to us, with all respect, I actually slightly disagree with that. Because the consent that the court was looking at in—there were two different elements of this in Sharif and Shor. One question was, had the person raising the Article III proceeding consented to participate in it, which they had? And then the second question was, having done that, did they waive their Article III objection? And in Sharif, as I read Sharif—tell me if you think this is wrong—I read Sharif as saying, he waived—he's waived the personal aspect of Article III. That's gone. Perhaps the court goes on and says, but there's a structural question. And that normal rules of waiver and forfeiture don't apply to those for good reasons. And then the court goes ahead and takes a look at the structure and it says, it concludes, that where someone participates voluntarily or with consent in the administrative process and there's sufficient federal court supervision of the process, there isn't a structural Article III problem, and then it's sent it back to the Seventh Circuit to ask whether or not, with respect to the personal side of the question, he had in fact consented or if not, whether he had forfeited his objection. That's the way I read the case. Is that wrong? So, yes, I think it is, Your Honor. We read it differently. We think that what the court said was, much more broadly, that the Article III aspects could be forfeited and that that's what the court said. But—and I think also the court— But the personal— —is consistent with the way the court has read in Ploutt, has read Schor, which is to say Schor is an exercise of the court's discretion. And if I could get to that for a sec, even if, Your Honor, you disagree with me on this. The question before the court is, is this the kind of case where you would like to exercise your discretion to reach that? Now, Petitioner argues that you should because this is—because of the importance of the issue. But I would suggest that actually the exercise of the discretion runs in exactly the other direction, which is to say, in an issue that has already deeply divided the court, that is principles of constitutional avoidance and issues about setting the policy for the would suggest that this court really hesitate before exercising its discretion to reach an issue that it didn't have to reach because the issue wasn't raised by Petitioner below. And so to the extent the court believes that there is discretion, and I think that's surely what Ploutt and Schor stand for, that at most the court has discretion to reach the structural issues. This would be a case where it really shouldn't be so. The reason you think we shouldn't exercise our discretion is because this is a question of a difficult constitutional issue, and since it was not raised, we shouldn't answer it. I think that the court should then decide it on a plain error. I think that's exactly right. I think that is what principles of constitutional avoidance are about. What the panel decision did was really set the United States military policy and the use of military commissions for all wars going forward, providing an international veto. How do you respond to your opponent's argument that even under plain error, Ballou prevails? So, Your Honor, I think that that argument really holds no force and actually is refuted by Ballou 1. This case is easier than Ballou 1 because what Congress has done is acted to remove the law of war limit that was on the executive branch authority in 1821 in Article 15, which the court in Hamdan recognized was an express limitation on the executive branch authority. So the question here is whether it's plain error, not when you're in Category 3 of Youngstown, not when Congress has put an express limit on the executive branch authority, but when Congress and the executive branch have joined together to state that something can be tried in a military commission. Does Youngstown apply when we have a separation of powers question involving the power of the judiciary? I'm sorry, Your Honor. I said does Youngstown apply when you have a separation of powers question involving the judiciary? So I think the question is why would the agreement of the President and the Congress affect the court's view of the question of whether an article is encroaching on Article 3 jurisdiction? So here's what I would say, Your Honor, is both Justice Kennedy's opinion and Justice Stevens' opinion in Hamdan both referenced this as a Category 3 case and thought that was very relevant to the analysis. It's not dispositive, as Your Honor suggests, but the judgment of the political branches and exercise of the war powers does seem to me to implicate exactly the kinds of concerns that Youngstown was interested in. So I'm curious about the scope and nature of your argument about the American common law of war because I heard you just say earlier today that inconspiracy is not yet recognized in international law. And it wasn't clear to me entirely from your briefing that you were arguing that the American common law of war in practice is an effort to achieve recognition in international law by the international community or whether it's just part of the domestic separation of powers jurisprudence. And if it is the former, if it's the United States' foray into an effort to push the boundary of international law, I understand that, but I find it quite surprising as a position for the United States to take because, of course, as I'm sure you've considered, that would mean that other nations, if we prevailed in the international law of war recognizing co-conspiracy, that would really put our people and our military in some jeopardy. And so I just want to understand what role you think and what limits the American common law of war as you've cast in this case play. So there are a couple of things. First of all, the reciprocity concerns that your honor identifies are real, but we agree with the point Judge Kavanaugh made in Ballou, which is to say they are real. That's the reason why the United States complies with its international obligations, but that's a judgment for Congress to make and it is the judgment that Congress considered. The reciprocal implications are reflected throughout the debates on the 2006 Act and it is something that Congress considered and that the executive branch has considered and made that judgment. As to exactly what we think the law of war, the relevant law of war is, what we've said is law of war is the international law of war as supplemented by the experience and practice of our wars and our wartime tribunals. I have read that time and time again, but it sounds, I mean, as I've always understood the American practice is the reason our courts and we and our commentators, OLC, the Attorney General, Speed, look to the American experience is because it's our precedent about international law and you're making a different argument. So I think I am, your honor. I don't think that that's a fair reading of how the court in Hamdan or the court in Kirin really approached this. In other words, it's possible to say, I think, as your honor's question suggests, that in fact you look to American law because you're just trying really to figure out what the international law is. But I don't think that's a fair reading of what the court actually did. The court didn't look to French and German and Dutch traditions. What the court did was spend page after page looking at the American precedents and the American law of war and then at the end in Hamdan in the plurality opinion said, yes, international law confirms that. I think what the court was reflecting is that the common law of war is something that has always been very much a part of our military commission experience and it's relevant to the Article 3 analysis. Article 3 is a situation in which, I'm sorry, I can just finish the sentence, in which history matters and the kind of history that we're talking about here is relevant to the court's Article 3 analysis today. I'm sorry, Judge Rogers. I was just going to say, didn't all that discussion arise in the context of trying to decide whether or not our American tradition was contrary, that we had rejected some offenses that the international law of war had? So no, I don't think that that's at all a fair reading of Kieran, Your Honor. Well, Kieran almost said that verbatim and then the plurality just builds on that. And as you yourself just said, in Hamdan, the plurality says it confirms. It doesn't go beyond. Well, I think what it said, it confirms that it's not within the law of war. A number of the questions today insert the word international, which I don't think is in those opinions. But a couple of points on both Kieran and Hamdan, Your Honor. First of all, Kieran makes very plain on pages 45 and 46 that he is not articulating the outer bounds of the executive authority. In fact, what it says is we refuse to identify the outer bounds because this is plainly within those bounds. Second is the point that I made earlier, which is that both Kieran and Hamdan were operating in a situation in which the court viewed Congress as having placed a constraint through Section 821, Article 15, that military commission proceedings had to be under the, quote, law of war. That is this precise constraint that Congress removed in 2006 from these military commissions. So I do think that it's a very different analysis that the court is going through now, now that Congress has acted, from what the court was doing in Kieran and what the court was doing in Hamdan, and that's not a surprise. What the court said over and over in Hamdan, both the court and the plurality, was in analyzing this, at least in the absence of congressional action, Congress hasn't acted to define. Kieran had said Congress hasn't crystallized the requirements of the law of war. What all of those decisions are doing, I submit, is asking Congress to weigh in precisely because the Supreme Court has recognized that this is an area where the answer isn't just we look to the commentators on international law and figure out what they think. The baseline, arguably, should be the text of Article 3, which contains no exception for military commissions, and then the argument would go Kieran carved out an atextual exception to Article 3, but we should narrowly construe it because it is an atextual exception. How do you respond to that? Your Honor, I think that Kieran establishes that exception, as in that what the court has said is that Article 3 reflects historical practice, and that regardless of whether you construe it broadly or narrowly, we think that this conspiracy, because of the long the court expressed as the exception for military commissions. When you look at Yamashita and you look at Kieran, what I think you see is an approach to the question under Article 3 that's quite contrary to the one petitioner is advancing here today. It's one much more of deference. It's one much more of flexibility, and it's one much more of allowing the United States to lead in these areas. I think that those cases are the ones which suggest that whether you view that exception narrowly or broadly, it's firmly established, and the history and the way the Supreme Court has approached it say that this falls squarely within it. One other question on standard of review. I would have thought, as the petitioner's brief says, the constitutionality of the military's jurisdiction over a particular offense is always reviewed de novo because it's a question of jurisdiction. Kieran refers to it on page 25 as jurisdictional. The authority of the tribunal over the offense or the subject matter seems to be quintessentially jurisdictional in the kind of thing that ordinarily, at least, would not be waivable or subject to being forfeited. So, Your Honor, I guess we think that this is something that the court in Ballou addressed. The court said that the NCA expressly confers jurisdiction on military commissions to try to charge offenses. The question whether that act is unconstitutional does not involve the court's statutory or constitutional power to adjudicate the case. I think the larger question is, does Article III confer jurisdiction on military tribunals over this kind of offense? And so, Your Honor, I think the answer to that is actually sure. Remember, in sure, there was a challenge that was quite analogous, which is to say that the argument was that the case couldn't be brought before the CFTC. And what the court said there was not, this is subject matter jurisdiction, so we're done. The court went into the Article III analysis that I discussed with Judge Tatel. And obviously, you can take from that different things. But I think the one thing you can't take from that is the mere fact that there's a constitutional challenge to the assignment of jurisdiction to another forum outside of Article III is itself subject matter jurisdiction that's just non-waivable and non-forfeitable. It's not how the court approached the question in sure, and it's not how this court approached it in the rule, recognizing that Your Honor dissented from that. I have another standard of review question, following up on my previous question about standard of review. I was surprised that the government didn't make more of the language in Kieran that we can only overturn the work of a military conviction if we are clearly convinced that what the court has done is unconstitutional. You didn't give much emphasis to that even though Justice Thomas and Justice Scalia and Alito endorsed that. Am I over-reading that? Is that not the right standard even if we go with de novo review? You haven't argued that. Well, I think, Your Honor, what I would say is that that was the standard the court adopted even when Congress had put a limit on the executive branch's authority. And part of our Youngstown argument is exactly that argument, that when Congress and the legislature put a limit on the executive branch's authority, the court should be quite wary and should require only the clearest evidence of error before it moves forward. So I guess I think that we are in a stronger position than we were in Kieran because, as I say, it really is important, I think, that what the court in Hamdan said was Section 821 is a constraint, an express limitation on the executive branch's authority, and even in that context, the court said what Your Honor alluded to in Kieran. I think this is a stronger case for whether you call it deference or whether you call it the court has to be firmly convinced that error has happened. I think this is a stronger case precisely because the Congress has eliminated that constraint and precisely because Congress did so in response to the Supreme Court's invitation to do so with the Supreme Court suggesting that that would be quite relevant to their analysis. I know that we also invited you to address the standard of review, so perhaps I'm not surprised at the position that the government took, but it is a change of position because before the Ambon court, the previous time when we were here, we didn't decide this issue, but this issue was teed up. The government took the position that Al-Balul had forfeited the claim, the ex post facto claim, but not, there was no argument about limitation to a plenary standard of review on this question, and before the panel, government counsel specifically said that he did not believe that it was forfeited, it was repeated, it was a long colloquy over several pages of the transcript. No, this is not forfeited. This is subject to de novo review, and even in the military commission back when Colonel Gregory was presiding, we know that Al-Balul's objections were, they were spoken by him, they were not spoken through counsel, but Colonel Gregory said, as I understand what you're saying, maybe you're challenging the proceedings as unlawful, perhaps the charge is unlawful, maybe from your perspective it doesn't state an offense, so that's the way I interpret your view, so the root of forfeiture seems to me to cut against the government arguing here that we should use plenary review, and then the subsequent litigation of the case by the government, and I do appreciate your position that because this is a difficult issue, plenary review might be appropriate, but I have thought that it wasn't a question until I read your brief that we were going to be looking at this de novo. So a couple of points, Your Honor. The first of Your Honor's questions I'll agree with in a sec, but let me just, a couple of preliminary points. First of all, I don't think to the extent Your Honor was suggesting that he had preserved it, that we agree with that. The kind of colloquy that you just quoted from Judge Gregory is not sufficient to preserve the argument. Despite what he said. Despite what he said, Your Honor, because I don't think he said— I said this is similar to a motion dismissed for lack of jurisdiction. So I think what he said was that, remember the question that he was being asked was, is this, by showing up, and do I waive my boycott, right? And what Judge Gregory said was, no, this is akin in that sense to a motion for lack of jurisdiction. But what Your Honor sees in the colloquy is that it's quite uncertain. He says, perhaps you're making this to the extent you're making that. Unless this Court were to adopt a very different preservation rule than it has applied in the criminal context, I don't think that that's the kind of argument that could preserve a jurisdiction. And indeed, there was no suggestion that what Mr. Bellull was saying, gosh, if you just tried me in an Article III court, I wouldn't be boycotting. So I don't think that preservation is really the issue. The judge says this is an objection to the legitimacy of the military commission. And Bellull himself talks about the military, in essence, the military aspect of the proceeding. So, Your Honor, I guess I think, you know, the transcript is on page— I'm confused. I'll grant you— Right, it's page 49 and 50 of the appendix. Because the government goes on and again and again throughout the— Right, but then to get to the thrust of your argument, which is really, I think, has the government waived it. I mean, in response to the Court's question, our view is that plain error applies. With respect to what happened to the panel, there is the colloquy that Your Honor refers to, and it's in the briefs. I think when you read the whole thing, there's a little more uncertainty in the colloquy than perhaps I think that last paragraph would suggest, but be that as it may. I think if the Court, at the end, again, stepping back, I think, the real question for the Court is if you think that the government has essentially forfeited forfeiture, then the Court is left with two discretionary judgments. So which one trumps? And this goes back then to the point I made earlier and to the way Your Honor started the question, which is to say, to the extent the Court believes it's in that box, which we don't think it is, but to the extent the Court does, then the question is, is this the kind of case that the Court should exercise its discretion to decide? And I think the principles for the reasons I said, and not just to repeat, but just to put the final point, to the extent the Court has that discretion, to the extent the question is should the Court exercise that discretion, I think to act to constrain the war powers of the executive branch in a situation which the Court has already indicated some deep division in the expressed opinions already, I think those things counsel very strongly for, not suggesting that the government has forfeited forfeiture in the way that Your Honor's describing. For the government to prevail, let's suppose we review this de novo, do we have to believe that, do we have to hold that any prosecution for inquiry conspiracy under this provision of the MCA comports with Article III, or just this particular prosecution? So, Your Honor, the answer to your question is no, just this one, and I think it's very important for a number of reasons. First of all, the concern about inchoate conspiracy is the idea that tentative agreements and half-hearted gestures are the kinds of things that shouldn't be swept up in conspiracy, but that is not at all what we have here. What we have here is overt acts that involve military training at Al-Faruq, the swearing of bai'at to bin Laden, the swearing of bai'at by the 9-11 hijackers, and acting as a personal media secretary to bin Laden, and we have, as Your Honor points out, no doubt that the 9-11 attacks happened. Whatever the concerns about a broad version of conspiracy or the conspiracy that approaches mere agreement or tentative understandings or anything like that, that is not what we have here. The answer to Your Honor's question, much in line with my earlier point, is that no, what Your Honor should be deciding is this particular conspiracy, and whether this particular conspiracy is one that the court should find troubling. Stepping back, I think that inchoate conspiracy, as a general matter, is something that there is a history of trying. The Grenfell example in our brief, and both Kieran and Koltoff separately charged it. But again, to the extent the court has the concerns about the scope of inchoate conspiracy, this case doesn't present this. What's your response to your friend's argument that there was really, notwithstanding the wording of this specification, there was really no proof that the petitioner had foreknowledge of the 9-11 attacks? I don't think it's our contention that he had foreknowledge of the 9-11 attacks. I think our contention is that he agreed to commit the listed offenses, which include attacks on civilians and attacks on civilian objects and things like that. We did not, I don't think we attempted to prove that he had specific foreknowledge of the 9-11 attacks themselves, although those were an object of the conspiracy. Are there any further questions? All right, thank you very much. Well, as usual, we've let both sides go over, so we'll give you five more minutes for rebuttal. Thank you very much, Your Honor. Let's try to keep it within the five. I'll do my very best. I do have some more specific points in response to questions given to my friend and to me, but the point I think that needs to be just stated right up front is that the government has offered you no rule. It is demanding, according to its brief, the utmost deference to the political branch's judgments with respect to when the Article III courts can be put to the side in favor of military commission. I think its rule is that it suffices, maybe not being necessary, but suffices to show that it's firmly rooted in historical practice, and we can leave for another day a case where an offense is not rooted in historical practice. But enemy combatant in a war or hostilities, an offense rooted in historical practice. So I think that's the limit. Well, I didn't hear that as a limit. I heard that as a... That's the limit that suffices, leaving open for, you know, another day to argue about whether the historical practice is necessary in the event Congress wants to establish new offenses. Sure.  And I can say that with great confidence, particularly on their effort now to say, well, Belul, he's a bad guy. He's an enemy combatant. It's obvious that we should be able to try him by a military commission, because the Office of Legal Counsel's own review of the legality of military commissions under ex parte here, and this is cited on a footnote, I believe, of page 24 of our brief, says that the status of the offender is irrelevant with respect to law of war, military commissions, and of course it has to be. Look at the Lincoln assassins. The actual assassin in that case was not an enemy combatant, he was an actor, and the idea that enemy combatants somehow creates a talisman that the government can wrap around an individual in order to put them in the military commissions is not supported by history, it's not supported by the text of the Constitution, and it's certainly not supported by ex parte here. And, you know, they claim, they seek the utmost deference, you know, in favor of the political branch's time of war, and we're not denying that, they are entitled to deference with all sorts of war-making powers, but the judiciary is a co-equal branch of government who has a monopoly on the law in this country. What would happen if, Judge Tittle had asked a question of Mr. Gershengorn about what if international law had specifically considered and rejected, how would we know what, it's not like a Supreme Court of international law out there, how would we know when international law has rejected something, and in particular, what would, I know your position here is conspiracy clearly out, what would happen, what leash would Congress have and what limits would they have if it was actually directly ambiguous or contradictory rulings out there from assorted tribunals and scholars? In that circumstance, you know, there may be some room for deference as long as Congress is not clear, again, we're still only talking about Kieran's first condition, but... What is the room for deference? Is it that that would be Congress's power to define, sort of pick between competing international views of law, or... So long as there's an established norm or offense, sorry, an offense under international law, but here we have, we have rejection here. My hypothetical is you've got one person saying, heck no, it's never been, and it's not part of the law of nations, or the law of war, as viewed by the law of nations, and another Well, here we have that rejection. We have that rejection at Nuremberg, which was predominantly administered by the United States. We have it at Tokyo, which was done under the direct supervision and control of General MacArthur, and candidly rejected very few arguments by the prosecution, and even looking to, again... My question is, if you had a conflict, you had different sources, you looked at all your sources and it really was 50-50 down the middle, and they're at diametrically opposite views, never, no way, this is international law, sure it is, sure it is. If you had a diametric sort of opposition, perhaps Congress would have some deference to pick a side, so to speak, but here there is no side, and the government admits that. The government... Could I... Sorry. No, I didn't mean to interrupt you. I guess I want to get back to my original question to you is, where in 1787 would they have looked when there were no Nuremberg tribunals, or Yugoslavia tribunals, or any of the sources that have been used in this case? They would have looked at state practice, and in fact, George Washington, when he tried Major Andre, there was a question about how you could execute a spy, and Major Andre, because he was a British officer, asked to be shot, and George Washington referred that to his military lawyer at the time, and the military lawyer came back and said, under the law of nations, under state practice, under the law of nations, spies are to be hung, therefore he must be hung, and so this wasn't an exotic problem back then. The framers understood what international law was, they were comfortable with it, and they looked to... Congress couldn't have said, shoot, rather than hang. Well, if Congress... I think... Well, hanging was ignominious, and so if Congress wanted to sort of define, you know, to narrow international law, which, to narrow international law, to make it less severe, or more consistent with our values, and I'll put an example that actually exists up, is the United States has reserved its, has strong reservations about incitement to commit genocide, because of our First Amendment protections, and so that might be an area where Congress's power to define will exclude something that's part of international law, but brings it into the American context. If I can directly, though, address Judge Wilkins' question, respecting, you know, what we have here, what is this case about? And my friend said, well, the concern about agreements is letting innocent people be captured. No, that's not the concern about agreements. The concern about agreements is that proving them is a fundamentally judicial inquiry, and this case shows that. This was not a battlefield evidence case, they called cooperating witnesses who were forensic experts, they had a paid subject matter jurist, paid subject matter juristic, subject matter expert, excuse me, it was a weak look. Is this the same evidence to prove joint criminal enterprise, or aiding and abetting? They may, but again, as my friend conceded, he said, when asked whether Ballou could have been convicted for aiding and abetting, he said, I don't know, I don't know, and if the government doesn't know whether Al Ballou could have been convicted for some substantive offense under some other theory that the government neither charged nor proved nor attempted to have the members fined, then this court doesn't know. I heard, in response to Judge Wilkins, I heard Mr. Gershon go and say, this court doesn't really have to face the question of inchoate or standalone conspiracy in this case, because that's not what this is. That is what this is. Why don't you respond to that? Why, he said, there's this other evidence in the record that counsel identified, and so it's not just inchoate conspiracy. Well, again, this court's normally not in the business of trying to piece through the record of trial to see what might have been proven had the government charged and instructed on it and had the members found it. Here, the government committed itself early on to an inchoate, traditional, vanilla conspiracy prosecution in a trial that looked like a traditional, inchoate, vanilla conspiracy prosecution. The members found that after being instructed precisely that that was what they were supposed to do. And then today, my friend stands here and says, I don't know if we could have actually had the evidence to get him on anything else. And if he is saying they don't know today, this court doesn't know today. And this court should just read the record, read the charges. Because at the end of the day, conspiracy is what's at issue in this case. Mr. Paris, what do you make of the fact that the reference to conspiracy in the Military Commissions Act refers to victims? And in that way, it seems to be almost more of a codification of joint criminal enterprise, more aiding and abetting, than a codification of conspiracy. And I wonder if, in some kind of constitutional avoidance, if we should read it that way, or... We haven't given that question a whole... The question for Mr. Grisham on how he reads it, maybe instead of answering it for him. Certainly, that was not at issue here. The government went for the tradition... There was no question about victims. There was no measure of the sentence based on the impact to the victims of 9-11 attack. And so, if that construction is available to the government in pursuing other sort of completed conspiracies, and that's sort of just a part of, if that's just a reframing of joint criminal enterprise, that may be okay, but that is so different from our case that I hesitate to take it... Why is it not a statutory defense on your part? I'm sorry, a statutory... I get this because it wasn't raised in the... Sure, because it's only until this... Conspiracy is a term of art. And so, when Congress enacts a conspiracy, and the charges at trial allege conspiracy, the elements are all of conspiracy, it's a conspiracy case. This is an incoherent conspiracy case. The government has proceeded on that from the beginning. And that's unconstitutional. It's under Callan v. Wilson that's unconstitutional. The government admits it can't... Callan wasn't the Define and Punish Clause case, right? No, but it was an Article IV case, where the... Congress has a far more... You don't think Define and Punish has any relevance at all? I think it has secondary relevance, because ultimately the second factor, and I hate to keep coming back to these, but I think it's important, and Karen may say the standard is twofold. Offense against the law of war, not a crime triable by jury. Conspiracy is a crime triable by jury. And for the government to sort of say, well, Congress has... So is blowing up the World Trade Center a crime triable by jury, isn't it? Sure, but if it's a war crime under international law and its elements satisfy a crime under international... But it's still triable. You're not suggesting that even the main conspirators or the main subject principles couldn't be tried in an article-free court. No, but that's because there's a... Is it triable by jury? It certainly is. But here is a situation where there is a specific kind of crime that is firmly established as entailing a jury trial. I would just give this court the other example, the most salient example, because there are cases or at least precedents on it, is treason. Treason unquestionably deals with the war powers. It unquestionably deals with people who could be termed any combatants. There are many international offenses that look awful lot like treason, but it certainly could not be tried in a military commission. And in fact, when it was in the context of the Civil War, the convictions were thrown out because they were only triable by jury. And conspiracy is the same. Conspiracy is such a unique and, again, indicative federal crime that's... Let's pause and see. Has anybody... Yeah. A second ago, you said that Congress may want to change international law to, I think you said, make it more consistent with our values. And that highlights for me a concern about your position because you would, as a matter of U.S. constitutional law, establish international law as a limit for all time on the president and Congress's ability to use military commissions as part of the war effort. So if international law may not be consistent with our values, why should we put international law into the U.S. Constitution as a for all time limit? Well, I would ask the framers that question because they put the offenses against the law of nations explicitly into Section 8, Clause 10. But if I can also get to this one point, and I think this quote may help, Your Honor, is it's from... I'm sorry. Oh, I'm sorry. It's from Inouye Yamashita. It's on page 9 of our reply brief. And the government says, well, all that Congress has really done here is just taken the law of war requirement out of military commission jurisdiction. But I think it's important to remember that by doing that, they are essentially conceding that it's unconstitutional because Article 15, as construed both in Kirin and in Yamashita, reaches, quote, all offenses which are defined as such by the law of war and which may constitutionally be included within that jurisdiction. So Article 15 already reached to the outer limits of Congress's power. And so if the government is standing here saying that it can only win because Article 15 has essentially been made, reached even further, that's a concession that ultimately we agree with is that the conspiracy charge in this case is plainly unconstitutional because it is an infamous crime and it's not an offense under the international law of war. No further questions. Thank you, Your Honor. We'll end with a point, apparently, if the parties agree, and the Court will go on to struggle over the matter. The matter will be taken under submission.
judges: Garland, Henderson, Rogers, Tatel, Brown, Griffith, Kavanaugh, Millett, Pillard, Wilkins